Argued October 7; defendant suspended November 17, 1936

## Ex parte EASTMAN
### (62 P. (2d) 27)

In Banc.

*Will H. Masters,* of Portland, for Oregon State Bar.
*Frank Hilton,* of Portland, for petitioner.
*Elbert Eastman,* of Portland, in *pro. per.*

ROSSMAN, J. This matter is before us upon (1) a complaint filed against Elbert Eastman, a member of the Oregon State Bar; (2) the answer filed by the accused; (3) the evidence introduced before the trial committee; (4) the decision and recommendations of the Board of Governors of the Oregon State Bar;

and (5) a petition by the accused addressed to this court in which he prays that we review and reverse the decision of the Board of Governors. The decision of the Board of Governors affirmed the findings of the trial committee that the accused was guilty as charged. Its recommendation to this court is that the accused be suspended from the practice of law for a period of one year.

The accused, Elbert Eastman, was admitted to practice in this state in the year 1912, and is now a member of the Oregon State Bar. We shall refer to him hereafter as the defendant.

Succinctly stated, the facts developed by the evidence are: August 13, 1934, the defendant filed a petition, signed by himself, for the probate of the estate of Alex Schafer, deceased, and to have appointed as administrator Fred Schafer, a brother of the deceased. Forming a part of the petition was the following affidavit:

"State of Oregon,  } ss.
  County of Multnomah, }

I, Thelma Schafer and Fred Schafer, being first duly sworn, depose and say that I am the petitioners in the above entitled action; and that the foregoing petition is true.

Thelma Schafer

x  Fred Schafer

Subscribed and sworn to before me this 11th day of August, 1934.

My commission expires Aug. 11, 1934.

Elbert Eastman,
Notary Public for Oregon."

August 13, 1934, the court entered an order appointing Fred Schafer administrator. Thelma Schafer, who was the widow of the deceased, did not sign the above

affidavit, and never took oath to the above. The defendant admits that he himself signed her name to the foregoing.

In March, 1934, the defendant, after having obtained an order appointing one Orpha Alvord guardian ad litem for her minor son George, instituted an action against one L. Veltman which sought the recovery of $1,000 damages on account of a personal injury suffered by the minor. The defendant's contract of employment contemplated that he should advance the costs and receive 50 per cent of the proceeds. After Veltman had filed his answer, the defendant received a letter from the guardian of which the following is a copy:

"April 16-34
Portland Ore

Mr Eastman
Would you please drop any proceedings against L. Veltman

Mrs Orpha Alvord
2426 N.E. 16 Ave.
Portland"

About this time the defendant and Veltman's attorney agreed that Veltman should pay the plaintiff $45 as a compromise of the claim. April 13, 1934, the defendant received from Veltman's attorney a proposed release which stated that in consideration of the payment of $45 by Veltman all liabilities arising out of the alleged accident were satisfied. Upon the same day the defendant returned this document to Veltman's attorney with signatures subscribed to it which appeared to be those of George H. Alvord and his mother, Orpha Alvord, and also the attesting signatures of the defendant and W. C. Vandersol, as witnesses. Veltman's attorney, believing these signatures to be genuine, accepted the documents and sent to the defendant

a check for $45 payable to the latter, which he cashed. Neither George Alvord nor his mother signed this document, and they received no part of the $45. They remained wholly ignorant of this transaction until October 13, 1934, when they inadvertently discovered it.

Alex Schafer died August 11, 1934. Immediately following his death his parents, his brother Fred, and his widow Thelma conferred concerning the burial. The family lacked funds with which to discharge the expenses. The parents testified that, since they had guaranteed payment of the expenses, Thelma and they agreed that the proceeds of Alex's estate should be shared by them and Thelma, and that Fred should be administrator. The estate apparently consisted of a $100 policy of insurance and a claim for damages against an alleged wrongdoer who had caused Alex's death. Thelma denied that any such agreement had been effected, and insisted that she had never consented that Fred should be the administrator. Her testimony indicates that at the conference a division of the estate and the appointment of an administrator were not mentioned.

August 11, which was on Saturday, Fred went to the office of the defendant, requesting the latter to prepare the necessary papers for the probating of Alex's estate and for the appointment of himself as administrator. Fred swore that on Monday he and Thelma went to the defendant's office for the purpose of signing the petition. According to Thelma, the sole purpose of this visit was the collection of the policy of insurance. Apparently at this time Fred signed the above affidavit and later the defendant signed Thelma's name to the same instrument. The defendant admits that he disguised his handwriting when he signed Thelma's name, stating, ''I wanted to show it

was different". Upon the occasion of this visit Thelma's mother accompanied her, and Fred's father was also present. The latter, describing the purpose of this visit, and referring to the petition as an agreement, swore: "We came down with the intention that she could sign that agreement which she didn't sign. She and her mother kind of run out on us and didn't come back. They said they wanted to go places, and they didn't come back and sign." The following is also quoted from his testimony:

"Q. Did anybody ask her to sign Monday? A. I don't remember that anybody asked her to sign Monday.

"Q. Why didn't she sign Monday? A. I can't tell you why she didn't sign it Monday."

Fred accounted thus for Thelma's failure to sign: "I think she was upset, she claimed, and didn't have time, as she went out to buy a hat and some things, and had to make some arrangements, and she said she would be back and she didn't do it." Thelma's mother swore that during the course of their conference in the defendant's office her daughter was not asked to sign anything. Thelma, as we have already seen, claims that there was no agreement contemplating Fred's appointment, and that the purpose of the visit concerned the policy of insurance.

Thelma and her husband had been separated for approximately five months prior to the husband's injury, but had become reconciled a day or two before his death. The defendant was unaware of the lack of harmony within the family, and swore he believed Fred's statement that the family had agreed upon Fred's appointment. He testified that all parties appeared to be anxious to have Fred's appointment made as quickly as possible, and that, since he was about to depart upon a trip to a distant part of the state, he, too,

was hurried. He swore that when it was time for Thelma to sign, "I asked them where she was and they couldn't locate her, and I asked if she had a 'phone, and she apparently didn't have any 'phone, and so I signed her name to the petition and took it up to the courthouse and filed it. And the next day—I think it was the next day—letters of administration were issued; and that day Thelma and her mother and Mr. Schafer and Fred were all there in my office." He claims that at that time he told Thelma of Fred's appointment, and Fred claims that he showed his letters of administration to Thelma shortly after he had received them. Referring to the fact that he signed Thelma's name to the affidavit, the defendant explained: "I should not have done that. I admit that. I should never have done it the way I did it. I just acted too quickly and thought that, since it was understood between them, it was all right to go ahead and get the letters filed." Referring to his notarial seal and signature, which indicates that Thelma swore to the preceding statement, he said: "There is the bad thing on that. I signed her name upon it after it was sworn to. I attached her name to the petition. * * * It looks that way, but that wasn't the fact. I know that. I didn't intend that it should be that way, although there is no question in the world, gentlemen, about her wanting Fred appointed as administrator." He added that, had he known of dissension in the family, he "would not have taken that liberty".

Although the defendant filed the petition, he believed that he did not show it to the circuit judge when Fred was appointed administrator. Following Fred's appointment the defendant made his contemplated trip, and upon his return home another member of the bar (C. J. Schneider) called upon him and stated that he

had been employed by Thelma Schafer to bring about her appointment as administratrix. Thelma swore that the defendant had not told her of Fred's appointment, and that the first information she had gleaned concerning that fact was from a news item. When Mr. Schneider asked the defendant to account for Fred's appointment and Thelma's signature upon the petition, he frankly admitted that he himself had signed the name. He made no attempt whatever to conceal any circumstance concerning the unauthorized signature.

The above, while it omits mention of many details, nevertheless affords a sufficient understanding of the first charge which is contained in the Grievance Committee's complaint against the defendant. We shall now proceed with a further statement of the second charge against the defendant. We have already mentioned the fact that young Alvord and his mother employed the defendant to institute an action against one Veltman, and that later they instructed him to dismiss the action. The dates of the satisfaction instrument, April 13, 1934, and of Mrs. Alvord's letter to the defendant, April 16, 1934, indicate that before the defendant received the latter he had already effected an agreement with Veltman's attorney for a compromise of the claim, and had received the $45 satisfaction money. However, the defendant, without explaining these dates, testified that he believed young Alvord's claim against Veltman was a promising one, and that he was greatly perturbed when he received Mrs. Alvord's letter. He swore that after receiving the letter he effected the compromise agreement.

W. C. Vandersol, whose name is signed to the aforementioned release, as a witness, is a member of the bar, but is not engaged in active practice. According to the defendant, "He hasn't an office. He was there,

around, doing a little work in my office at the time''. Vandersol had a friend named Ralph Martin, who was George Alvord's uncle. After George sustained his injury, Martin brought him to Vandersol, and the latter took him to the defendant. This is how this item of business originated.

The defendant, in his petition filed with this court, states that when he received the unsigned release, after having agreed to accept $45 in full settlement of George's claim against Veltman, ''I turned the release over to Vandersol, and he immediately went out to the Alvords. He had an office next door to mine and sometime later produced the release and asked me to sign as a witness, which I did. I think the money was paid right away. In any event, I turned $22.50 over to Vandersol and Martin and I retained my half. * * * Martin and Vandersol were looking after the Alvords at all times. I didn't even know where they lived, but Vandersol and Martin did, and that release was all made out and signed up when it was delivered to me for my signature as a witness, as a formal matter. I never at any time denied signing as a witness. * * * I admit that I should not have signed the release as a witness. * * *'' As a witness before the trial committee, the defendant was asked whether the Alvords signed in his presence, and answered: ''I don't think so. Not in my presence. I think Martin went out and got that, and I signed that afterwards.'' We now quote further from the transcript:

''Mr. Masters: Where did he go to get the signatures?
''Mr. Eastman: To Mrs. Alvord.
''Mr. Masters: Where did she live?
''Mr. Eastman: I had their address at the time.
''Mr. Masters: I understood Mr. Solomon to say that

it was fifteen minutes after he gave you the release that it came back signed.

"Mr. Eastman: I don't think so. I don't think so. I think it was Mr. Martin got it signed. Mr. Martin brought this into the office. I had nothing to do with it in that respect. If that is the fact, Martin is the fellow who signed it. Now, he came back with the release all signed, and I signed it and sent it over to Mr. Solomon's office."

Martin was outside of the state of Oregon at the time the testimony was taken and did not testify. From Vandersol's testimony, we quote the following:

"Q. Did you have anything to do with this release, other than signing your name as a witness? A. Well, at the time this thing was terminated, Mr. Eastman gave me some papers. I believe they must have been the release, because it was at the time, or just after they said they wanted to dismiss the case and I took the papers out to their address that we had there. I think it was on Thirty-second Street. It was on some street though, between Thirtieth and Thirty-fifth, I should say —between Hawthorne and Division, I think, and they told me that, at that address, they had moved to St. Johns. I don't believe at that time that I went to St. Johns with this, but it strikes me—to the best of my recollection of it now, that I got hold of Martin and told him to have them come into the office to sign this paper.

"Q. Did Martin bring them into the office? A. That is my impression.

"Q. That is your impression, that he brought them into whose office? A. Into Eastman's office.

"Q. That he brought them into Eastman's office? A. At that time I had one room and he had the other. We had two rooms, together, Eastman and I.

"Q. At the time you signed your name as a witness, they were in the office and signed this release—is that it? A. I think that is the way it was. Yes, sir."

Upon cross-examination, his recollection proved to be very blurred; for instance, his final answer was:

"I have a hazy recollection that they were both in there to sign it, yes sir. Of course, that has been two years ago. It is hard to remember in detail."

The Alvords knew nothing concerning the fact that $45 had been paid in satisfaction of the claim until six months later when George's brother, while in the office of Gus Solomon, Veltman's attorney, upon another item of business, inadvertently discovered the fact of payment. George and his mother swore that the signatures to the release had not been signed by them. Since they did not receive any part of the release money, it seems clear that they were ignorant of the existence of the document at the time of the purported signatures, and that the signatures were forgeries.

When Solomon and the Alvords, upon discovery of the above facts, showed the questioned document to the defendant, the following, according to the defendant's petition addressed to this court, occurred: "He (Solomon) brought two young men with him and said they were both Alvord boys. I recognized one of them as the boy involved. He (Solomon) asked me if that was my signature on the release. I told him it was. He said, 'Well, they didn't get the money'. I told him I didn't believe it, and he got sore. He said he was going to take it to the bar association. I told him to go to it. He then said I would have to pay the boy. I told him I had already paid the $22.50, and he repeated that he did not get the money. I then issued the boy a check for $22.50, but I post-dated it three days or so. I then hunted up Vandersol and demanded back what I had paid out. He promised to pay me, but so far I have not gotten the money."

The above is not a statement of every detail developed by the evidence, but affords an understanding of the basis of this charge against the defendant.

From the trial committee's findings, we quote: "While the committee is unable to determine who actually forged this release, we believe from all the evidence that Mr. Eastman had knowledge at the time the release was delivered and the money paid that the release was not genuine." The decision of the Board of Governors states: "The said Elbert Eastman had knowledge at the time said release was delivered and the money paid that said release was not genuine." Concerning both charges, the defendant, in his petition, states: "I want to impress upon the court the fact that I intended no harm, but only desired to carry out the wishes of my clients."

■ From the above, it appears that (1) The defendant signed Thelma Schafer's name to the affidavit without authority from her. It may be, as he says, that other members of the family had told him that Fred's appointment had been agreed upon; nevertheless, Thelma never authorized the defendant to attach her signature to anything. (2) He abused his authority as a notary public by making it appear, whether he so intended or not, that Thelma Schafer had taken oath to the instrument to which he attached his notarial seal. (3) He compromised the Alvord claim without any authority whatever from his client, and in violation of his client's express instructions in writing to "drop any proceedings against L. Veltman". (4) By sending the forged release to Veltman's attorney with his (the defendant's) signature as a subscribing witness, he represented that the signatures of the Alvords were genuine. (5) Upon receipt of the $45 satisfaction money, he failed to submit an accounting to his clients. (6) Since $22.50 was due to his clients if the compromise was an authorized one, the defendant diverted it into other

channels by making his check for that sum of money payable to some person other than his clients.

Chapter 28, section 13, Oregon Laws 1935, provides that this court, in reviewing the recommendations of the Board of Governors of the State Bar, "may affirm, modify or reverse the same". The Board of Governors recommends that the defendant "be suspended from the practice of law for a period of one year". When the resolution which contained this recommendation was adopted by the Board of Governors, two of the Board's nine members cast negative votes "for the reason that the punishment was not considered adequate", so the resolution declares.

The findings of the trial committee state: "Mr. Eastman has practiced law for over twenty years, and, as far as the committee is advised, the charges which we have considered are the first charges which have ever been filed against Mr. Eastman." The defendant has a wife who assists him in his office work, and two children. He is 48 years old.

Undoubtedly, the recommended penalty, if adopted, will prove to be onerous, for in the course of one year's suspension much of the practice accumulated in twenty years of perseverance will be lost forever. But the defendant's misconduct was serious. By employing a release which he knew was not genuine he obtained $45 from an adversary who was deceived by the document. And, by employing a signature which he knew was not genuine he procured the appointment of Fred Schafer as administrator of an estate. The defendant seems to believe that his conduct indicates nothing more than that he employed the slipshod methods of some attorneys who take an acknowledgment of a signature by telephone, or who obtain a signature to a pleading or

an affidavit before the statement has been reduced to writing.

Without in any way undertaking to justify such purported loose practice, the trial committee, before the facts concerning the Alvord charge had come to light, prepared findings which concluded with the following recommendation: "We recommend that the accused be reprimanded by the Board of Governors." Then, without objection, further evidence was taken, and, finally, after all of the circumstances concerning the Alvord matter had been disclosed and the pleadings had been amended (also without objection), the recommendations previously mentioned were made.

■ It seems impossible to justify the defendant's conduct by construing it as merely careless or in harmony with the purported loose practice of other careless attorneys. It is the duty of an attorney, not merely to possess a reasonably good knowledge of the legal principles which underlie our scheme of jurisprudence but also to exercise, in the discharge of his various professional duties, the care and diligence usually exercised by lawyers. He should not lend his signature to a fraudulent purpose, nor obtain money from an adversary by the use of a document which he knows is not genuine; nor should he file in any legal proceedings a document containing an affidavit to which he, and not the affiant, attached the oath-bearing signature. Chapter 28, Oregon Laws 1935, which creates the Oregon State Bar, places upon the agency just mentioned the primary duty of seeing to it that the lawyers of this state conduct themselves honestly and in accord with the approved standard of professional conduct. Responding to that duty, the Board of Governors has found that the charge made by the Grievance Com-

mittee is sustained by the proof, and has also found that the recommended penalty is a just one.

We believe that the charge is well fortified by the proof, and we also believe that the recommended penalty is a just one. The defendant will be suspended from the practice of law in this state for a period of one year after entry of the appropriate order.

CAMPBELL, C. J., and BEAN, BAILEY and RAND, JJ., concur.

KELLY and BELT, JJ., not sitting.